June 17, 2016

<u>Via ECF</u>

Honorable Vernon S. Broderick, U.S.D.J.
United States District Court
Southern District of New York
40 Foley Square, Courtroom 518
New York, New York 10007

      Re:    *Harris, et al. v. Bank of America Corporation, et al.*
             **Case Number: 1:15-cv-7683 (VSB) (GWG)**
             **Joint Letter re: Fair Labor Standards Act Settlement, Attorneys' Fees**

Dear Judge Broderick:

On March 28, 2016, the parties to the above-entitled matter notified the Court in their joint status report that the matter was being settled. (Dkt. #84). On March 30, 2016, the Court ordered that the parties provide detail regarding the terms of the settlement following the test for Fair Labor Standards Act (FLSA) settlement approval described in *Beckert v. Rubinov*, No. 15 CIV. 1951 PAE, 2015 WL 6503832, at *1 (S.D.N.Y. Oct. 27, 2015) (Engelmayer, J.). The Court further ordered briefing regarding the basis for an attorneys' fees award, invoking *Lopez v. Nights of Cabiria, LLC*, No. 14 Civ. 1274 (LAK), 2015 WL 1455689, at *7 (S.D.N.Y March 30, 2015) (Kaplan, J.). This letter complies with the Court's order.

I.      **THE PARTIES REACHED A SETTLEMENT THAT IS EXTRAORDINARILY BENEFICIAL TO THE FLSA PLAINTIFFS AND READILY MEETS THE *BECKERT* TEST.**

The $7 million settlement, entered into between Defendants Bank of America Corporation and LandSafe, Inc. ("Defendants") and the 123 named and opt-in Plaintiffs (hereafter, collectively, "Plaintiffs"), has been thoroughly and individually considered, and *personally approved* (without exception) by each Plaintiff, will pay each Plaintiff an average gross settlement payment of nearly $57,000. Declaration of Bryan Schwartz (Schwartz Decl.), ¶3; Exhibit A, ("Settlement Agreement"); Declaration of Matthew Helland (Helland Decl.), ¶3. This will result in an average allocation (net of attorneys' fees, costs, costs of administration, and Named Plaintiff Enhancements) of over $42,000 per Plaintiff, assuming the Court approves the settlement as already agreed-to by all Plaintiffs. Helland Decl. ¶3. The net settlement allocations are currently based upon a payment to each Plaintiff of $281.57 per workweek for their FLSA claims (and the same amount for each additional week within the applicable State of New York statute of limitations for New York Plaintiffs). *Id.* The settlement provides relief for a very substantial portion of Plaintiffs' alleged lost wages, as discussed below, despite the significant litigation risks facing Plaintiffs.

In *Beckert,* the court relied upon *Wolinsky v. Scholastic,* 900 F.Supp.2d 332, 335 (S.D.N.Y. July 5, 2012) (Furman, J.), adopting a five-factor test developed in the Eleventh

1

Circuit. *See Wolinsky,* 900 F.Supp.2d at 335 (citing *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010), applying *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982) (FLSA settlement requires court approval)). Under *Lynn's Food,* the court's responsibility is to evaluate the basic fairness of a compromise "resolving a 'bona fide dispute over FLSA provisions.'" *Dees,* 706 F.Supp.2d at 1241-1242 (discussing *Lynn's Food,* 679 F.2d at 1350).

This case primarily involved the federal overtime exemptions applicable to Plaintiffs -- residential real estate appraisers. Appraisers' proper FLSA classification unquestionably presents a "bona fide" dispute. Prior to obtaining this substantial settlement, Plaintiffs had not won a *single motion* in this litigation, let alone proven liability or damages. Defendants disputed and continue to dispute that residential real estate appraisers were improperly classified as exempt – asserting they are eligible for, among others, the FLSA's administrative and professional white-collar exemptions. Moreover, this is an open question in the Second Circuit, which has decided no FLSA appraiser cases. Defendants also assert that the highly-compensated exemption (29 C.F.R. §541.601) would cover most of the Plaintiffs, even if the administrative and professional exemptions did not apply. Defendants further dispute that Plaintiffs suffered any wage loss, let alone the tens of thousands of dollars per person recovered in this suit – and that any alleged wage loss would be drastically discounted by the fluctuating work week method, under 29 C.F.R. §778.114. These factors alone warrant approval. *Medley v. Am. Cancer Soc.*, No. 10-CV-3214 (BSJ), 2010 WL 3000028, at *1 (S.D.N.Y. July 23, 2010) (Jones, J.).[1]

The *Beckert* five factors are:

(1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion.[2]

---

[1] *Medley* is the S.D.N.Y. case cited in *Wolinsky* in support of the five-factor test. *Medley,* however, did not have a five-factor test, but approved a FLSA settlement based solely upon the following:

The parties represent that (1) they disagree whether Plaintiff was an "exempt" employee under the FLSA and the New York State Labor Law and (2) they differ widely as to the number of hours Plaintiff worked. Therefore, this settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses. It also enables the parties to avoid litigation risk. Moreover, the settlement agreement is the product of arm's-length bargaining between experienced counsel.

*Medley,* 2010 WL 3000028, at *1. The *Medley* reasoning strongly supports approval here.
[2] Judge Furman in *Wolinsky* (relied upon by *Beckert*) dropped the separate sixth factor from *Dees* – considering the opinions of counsel (*compare Wolinsky,* 900 F.Supp.2d at 335, with *Dees,* 706

*Beckert,* 2015 WL 6503832, at *1. The parties address each in turn:

    **A.**    **The Range of Possible Recovery Supports Approval Here, Where There Was a Real Risk of Limited or No Recovery.**

    "The determination of whether a settlement amount is reasonable does not involve the use of a mathematical equation yielding a particularized sum. Instead, there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Torres v. Gristede's Operating Corp.*, No. 04-CV-3316 PAC, 2010 WL 5507892, at *6 (S.D.N.Y. Dec. 21, 2010) (Crotty, J.), *aff'd*, 519 F. App'x 1 (2d Cir. 2013) (internal quotation marks and citations omitted). This is particularly true in the context of FLSA misclassification cases where the outcome is inherently uncertain and the risk of no recovery is significant. *See, e.g., Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 479 (S.D.N.Y. 2013) (Ellis, M.J.) (collecting FLSA misclassification cases dismissed in the Southern District of New York based on exemption defense). We discuss, below, some of the risks of no recovery Plaintiffs faced.

    As to Plaintiffs' potential recovery *if* they prevailed against Defendants' core exemption defenses (*see* ECF No. 43 at 11 (asserting "executive, administrative, professional, and/or relevant sales exemptions, among others, or a combination thereof"), Plaintiffs estimate their "full relief" for unpaid wages[3] at $8,380,000.[4] Helland Decl. ¶10. This calculation is based on Plaintiffs' actual payroll records produced for mediation and is extrapolated to include those who joined after mediation data was produced. *Id.* The calculation includes a three-year statute of

---

F.Supp.2d at 1241), but incorporated the evaluation of "experienced counsel" in the arms'-length bargaining factor.

[3] Plaintiffs' damage calculation used as the basis for measuring settlement fairness appropriately counts single damages only. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 458–59 (2d Cir.1974) (abrogated on other grounds in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2nd Cir. 2000)) ("[T]he vast majority of courts which have approved settlements ... have given their approval ... based on an estimate of single damages only."); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1324 (2d Cir.1990) (in an antitrust class action, "the district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing to a trebled base recovery figure). *See also Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 964–65 (9th Cir.2009) (determining fairness of class settlement "based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages"); *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 324-25 (3d Cir. 2011) (same).

[4] Unlike in some cases, Plaintiffs' damages are not continuing to accrue. Bank of America sold the entity for which the Plaintiffs worked (Landsafe Appraisal Services, Inc.) at the outset of this litigation to CoreLogic. CoreLogic, in turn, reclassified Appraisers as non-exempt. This makes the result particularly remarkable.

limitations under the FLSA (which requires a showing of willfulness to achieve),[5] a six-year statute of limitations for New York State law claims where applicable, victory on the fluctuating workweek method of calculating damages (discussed *infra*), and an average of 10 overtime hours each week of Plaintiffs' employment. *Id.*

In *Boyd*, Plaintiffs' expert conducted a scientific survey and reviewed all appraisal records for appraisers throughout the country to conclude with 95 percent certainty that appraisers in that action worked an average of at least 9.1 overtime hours per week. Schwartz Decl. ¶11. Here, Plaintiffs conservatively estimate 10 hours per week.[6]

Other litigation risks abound. Because many of the Plaintiffs earned over $100,000, Plaintiffs' full recovery would have been reduced by over 50 percent if Defendants had just won on the highly-compensated exemption, which requires meeting a lower bar than the administrative or professional exemptions - fulfilling only *one* of the prongs of the exemption defenses. Helland Decl. ¶11; 29 C.F.R. § 541.601. Defendants would argue that Plaintiffs only have to perform one or more duties that are exempt duties customarily or regularly - and that the appraising necessarily includes exempt duties, such as inspecting, researching, analyzing the value of a property, and making recommendations. *See* 29 C.F.R. §541.201(b). No Second Circuit court has decided this issue. Thus, Plaintiffs' estimated damages figure of $8,380,000 (based on 10 hours of overtime) would drop to $3,890,000 if Defendants prevailed on this issue. Helland Decl. ¶11.

The possible recovery by Plaintiffs could also have been significantly reduced if this Court adopted the fluctuating work week ("FWW") method of calculating overtime. Had the litigation continued, Defendants would have argued that the proper overtime rate in this case should be half, rather than one and a half times, Plaintiffs' regular rate of pay. *See, e.g., Ransom v. M. Patel Enterprises, Inc.*, 734 F.3d 377, 386-87 (5th Cir. 2013) (applying FWW method in FLSA misclassification suit). While Plaintiffs would have vigorously opposed the application of the FWW to this misclassification case (*see, e.g., Costello v. Home Depot USA, Inc.*, 944 F. Supp. 2d 199, 208 (D. Conn. 2013)), some courts have declined to grant summary judgment against the application of the FWW method in a FLSA misclassification case. *See, e.g., Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 433-39 (S.D.N.Y. 2013) (Failla, J.) (discussing application of FWW method of damages as applied to misclassified workers, and declining to grant summary judgment that FWW is inappropriate for misclassified employees); *Siegel v. Bloomberg L.P.*, No. 13CV1351 DLC, 2015 WL 223781, at *7 (S.D.N.Y. Jan. 16, 2015) (Cote, J.) (declining to grant summary judgment on whether FWW applies as a matter of law despite finding employees were misclassified); *Ramos v. Telgian Corp.*, No. 14CV3422PKCLB, 2016

---

[5] 29 U.S.C. § 255. Without a showing of willfulness, the statute of limitations is 2 years. *Id.*

[6] Plaintiffs acknowledge that Defendants disputed the validity of Plaintiffs' experts' findings and conclusions in *Boyd*, and dispute the application of such findings to this litigation. Moreover, while many Plaintiffs undoubtedly would claim higher overtime hours worked than those estimated by Plaintiffs here, or by Plaintiffs' expert in *Boyd*, in the view of Plaintiffs' counsel, the expert's survey and appraisal reporting data analysis is the most reliable method for the full relief damage calculation. Schwartz Decl. ¶11.

WL 1959746, at *3 (E.D.N.Y. May 3, 2016) (granting interlocutory appeal to Second Circuit on question of applicability of FWW). The 10 hour damages number of $8,380,000 would be reduced to $3,609,000 if Defendants prevailed on this issue. Helland Decl. ¶12.

Defendants also could have succeeded in asserting their good faith defense under 29 U.S.C. §255, to limit their liability period to two years, instead of the three-year period used as the basis for Plaintiffs' damage calculation, above, and/or to eliminate liquidated damages, under 29 U.S.C. §260. Prior to *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1276 (C.D. Cal. 2015), no court had addressed the question of whether real estate staff appraisers were exempt from the FLSA. In *Boyd*, as to the issues of good faith under section 260 and willfulness under section 255(a), the court denied summary judgment in favor of Defendants, but found, "The evidence is not overwhelmingly in Plaintiffs' favor, by any means." *Id.,* 109 F. Supp. 3d at 1312. Willfulness may have been a close issue in this case as well, and could have been resolved against Plaintiffs, reducing their 10 hour damages number from $8,380,000 to $5,743,000.

Here, the $7,000,000 settlement is 83.5% of the $8,380,000 theoretical maximum wage recovery possible in this case. But, as outlined above, it is certainly possible that Plaintiffs could have prevailed on the administrative and professional exemption, yet lost on the fluctuating workweek, willfulness, and the highly compensated exemption – a victory resulting in an award of only $975,480 if Plaintiff lost on these, even if they were to recover the full 10 hours/week of overtime estimated by Plaintiffs. Helland Decl. ¶14. The settlement exceeds this amount by over 700%. Given all of the risks that Plaintiffs' recovery would have diminished substantially, the outcome is well within the reasonable range of possible settlements. Indeed, it is an excellent result for the Plaintiffs.[7]

## B.   Settlement Now Greatly Alleviates the Anticipated Litigation Burden.

Settlement relieves the parties and the Court of significant burden in fully litigating this matter. Defendants would have insisted on deposing a significant number (if not all) of the Plaintiffs as part of their defense, serving document discovery on all of them - hundreds of

---

[7] A recent study published online by NERA Economic Consulting evaluated patterns in 613 wage and hour settlements from January 2007 to March 2015. Schwartz Decl. ¶3: Exh. B. The study's authors sought to scrutinize all wage and hour settlements in federal courts around the country during that time period. *See* Schwartz Decl. Exh. B at p. 1. According to the study, the overall median settlement in wage and hour class actions was $2.2 million. The authors found that a large proportion of cases have an average settlement value per plaintiff between $1000 and $4999, and that very few cases settle for more than $5000 per plaintiff. *See id.* at p. 9. Moreover, the study highlighted that many recent larger wage and hour settlements have resulted in relatively small average recoveries per plaintiff. *See id.* at p. 14; *see also id.* at p. 2 ("After controlling for the number of plaintiffs in a case and the number of years in the class period, we found a decreasing trend in the average settlement value per plaintiff per class year—from a peak of $1,475 in 2011 to $686 in 2014 and just $253 through the first three months of 2015."). The NERA study confirms the exceptional nature of the resolution in this case.

requests, on 123 Plaintiffs. Meanwhile, Plaintiffs might have been hamstrung in obtaining discovery by CoreLogic's takeover of Landsafe Appraisal Services, Inc. Furthermore, Plaintiffs would have had difficulty proving damages, needing to retain a costly expert witness to estimate their overtime hours, which the company (and Plaintiffs) never tracked. Time studies or other in-person observation are no longer possible because the appraisers no longer work for a subsidiary of Bank of America Corporation, and the position has been re-classified as non-exempt.

Moreover, the parties would be likely to have extensive motion practice, including conditional FLSA certification under 29 U.S.C. §216(b), decertification, and cross-motions for summary judgment. A ruling on the merits would, very likely, be subject to appeal, because the FLSA classification of real estate appraisers has never been settled by the Second Circuit.

By way of comparison, *Davis v. JPMorgan Chase,* which resolved the question of whether Chase's mortgage loan underwriters were exempt in the Second Circuit (*see id.,* 587 F.3d 529 (2d Cir. 2009), cert. denied, 559 U.S. 1107 (2010)), was commenced in 2001, and not finally resolved until 2011, with settlement administration continuing until 2013. *See* U.S. District Court, Western District of New York (Rochester), #6:01-cv-06492-DGL-JWF; *see also Hart v. RCI Hosp. Holdings, Inc.,* No. 09 CIV. 3043 PAE, 2015 WL 5577713, at *1 (S.D.N.Y. Sept. 22, 2015) (Engelmayer, J.) (Plaintiffs, represented by Nichols Kaster, litigated for over 6 years before achieving settlement four weeks prior to trial).

Thus, settlement at this juncture avoids the likelihood of very lengthy, complicated, and costly litigation - with transaction costs ever-rising, while the Plaintiffs' maximum damages remain fixed. Plaintiffs - all 123 of them - have each decided it is much more advantageous to settle now, on these terms.

### C.    The Seriousness of the Litigation Risks Faced by the Parties.

Plaintiffs' counsel Bryan Schwartz Law won partial summary judgment as to the overtime exemptions in a similar case, in *Boyd*, 109 F. Supp. 3d at 1276. Each of the Plaintiffs here received notice in *Boyd,* chose not to opt into the action under 29 U.S.C. §216(b), and, after seeing the favorable outcome for the participants in *Boyd,* decided to pursue his or her claim in this new action.

Yet, Plaintiffs were not assured of victory here. Because Plaintiffs were aware of, and chose not to participate in the *Boyd* litigation, Defendants would argue that the *Boyd* summary judgment order likely has no preclusive effect in this case. *See Lloyd v. J.P. Morgan Chase & Co.,* 791 F.3d 265, 271 (2d Cir. 2015) (in FLSA and NYLL case, no issue preclusion regarding arbitration clause because "Offensive collateral estoppel is inappropriate 'in cases where a plaintiff could easily have joined in the earlier action,' but declined to do so in favor of a 'wait and see' approach.") (quoting *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330 (1979)). In addition, Defendants would contend that the summary judgment order in *Boyd* was not "necessary to support a valid and final judgment on the merits" because the only final judgment entered in that case was approval of class settlement and dismissal of the *Boyd* plaintiffs' claims, which did not require that a prior summary judgment order be entered in *Boyd* plaintiffs' favor. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.

1995). Moreover, the *Boyd* decision is not controlling on this Court, being an out-of-circuit district court opinion. Accordingly, Plaintiffs started from square one in this case, and would have had to overcome *each* of Defendants' various exemption defenses anew.

Because Plaintiffs did not have a set work schedule, and spent significant time in the field conducting appraisals rather than punching in and out of a fixed location, the Court might have held that too many individual issues existed for Plaintiffs to proceed as a collective action. *See, e.g., Tracy v. NVR, Inc.*, 293 F.R.D. 395, 398 (W.D.N.Y. 2013), *aff'd sub nom. Gavin v. NVR, Inc.*, 604 F. App'x 87 (2d Cir. 2015) (decertifying FLSA collective action "[a]fter four years of exhaustive discovery" because the plaintiffs "had tremendous flexibility in terms of the manner in which they chose to allocate their time and resources to perform those activities.") Such an outcome would have dealt a devastating blow to Plaintiffs because each individual Plaintiff would then have been required to litigate their risky claims against well-funded Defendants without the ability to pool resources for counsel, expert witnesses, and similarly expensive litigation costs.

On the merits, Plaintiffs would rely heavily on *Boyd,* and on *Davis v. JPMorgan Chase* and its analysis, and holdings, that mortgage underwriters are non-exempt, based, *inter alia*, on the administrative-production dichotomy. *Id.,* 587 F.3d at 529. In *Boyd,* Defendants were unsuccessful in likening real estate appraisers to insurance adjusters - typically exempt employees - but they may have succeeded here, despite *Davis*. Ultimately, the Plaintiffs stood to recover nothing if Defendants succeeded on any one of their exemption defenses.

In the *Novartis Wage and Hour Litigation*, after winning at the Second Circuit (611 F.3d 141 (2d Cir. 2010)), the pharmaceutical sales representative plaintiffs settled their misclassification action for $99 million – and were granted final approval less than a month before *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) (abrogating *In re Novartis Wage and Hour Litig.*), which found this position exempt under the FLSA, and would have left the *Novartis* plaintiffs empty-handed. Schwartz Decl. ¶ 7; Exhibit C to Schwartz Decl. Here, Plaintiffs could have litigated their claims through trial and years of appeals only to recover nothing. *See, e.g., In re Farmers Insurance Exchange*, 481 F.3d 1119, 1132 (9th Cir. 2007) (reversing a $52.5 million plaintiffs' verdict, finding claims adjusters exempt); *see also, Bucklin v. Zurich Am. Ins. Co.*, 619 Fed. Appx. 574 (9th Cir. 2015) (claims adjusters exempt under administrative exemption, despite "routine" and clerical aspects of their position).

Moreover, decertification of a collective action[8] was a substantial risk - many Southern District courts have denied certification or decertified actions involving wage-hour

---

[8] Plaintiffs would have additional risk because courts disagree as to whether the FLSA decertification standard mirrors the Rule 23 certification standard. *Compare Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("there isn't a good reason to have different standards for the certification of the two different types of actions") *with Monroe v. FTS USA, LLC*, 815 F.3d 1000, 1011 (6th Cir. 2016) ("we may not examine [FLSA decertification] using a Rule 23–type analysis"). If this court took the Seventh Circuit's approach, it might have been more inclined at some point to decertify Plaintiffs' action.

misclassification claims. *See, e.g., Shayler v. Midtown Investigations. Ltd.,* No. 12 Civ. 4685, 2013 WL 772818 (S.D.N.Y. Feb. 27, 2013) (Forrest, J.); *Trawinski v. KPMG LLP,* No. 11 Civ. 2978, 2012 WL 6758059, at *6 (S.D.N.Y. Dec. 21, 2012) (Crotty, J.); *Romero v. HB. Auto Grp., Inc.,* No. 11 Civ. 386(CM), 2012 WL 1514810 (S.D.N.Y. May 1, 2012) (McMahon, J.). If the matter were decertified, each Plaintiff would individually have had to bear the considerable risks.

Ultimately, when each of the Plaintiffs individually approved this settlement, they decided these risks were too much to bear.

### D.   The Settlement was the Product of Arm's-length Bargaining Between Experienced  Counsel, with the Assistance of a Highly-Qualified Mediator.

The proposed Settlement was the product of adversarial, arms'-length bargaining between experienced counsel. Undersigned Plaintiffs' counsel are accomplished class and collective action, plaintiffs'-side lawyers, as demonstrated by their firm biographies. *See* Schwartz Decl ¶ 25; Helland Decl. ¶¶ 15-20. They and their firms have consistently been ranked among the top labor and employment law practitioners, and they have ascended to leadership of numerous plaintiffs' and labor/employment-oriented organizations, including the ABA, State Bar of California Labor and Employment Law Section, National Employment Lawyers Association, California Employment Lawyers Association, and Legal Aid Society - Employment Law Center. *Id.* Judge Engelmayer noted the following in approving a fee award to Nichols Kaster of approximately 33% in a recently-settled wage and hour matter:

> The high quality of Nichols Kaster's representation strongly supports approval of the requested fees. The Court has previously commended counsel for their excellent lawyering. *See* Dkt. 541 at 98 ("I have benefited by very high-quality briefing from both of you."). The point is worth reiterating here. Nichols Kaster was energetic, effective, and creative throughout this long litigation. The Court found Nichols Kaster's briefs and arguments first-rate. And the documents and deposition transcripts which the Court reviewed in the course of resolving motions revealed the firm's far-sighted and strategic approach to discovery.

*Hart*, 2015 WL 5577713, at *16. Similarly, in *Boyd,* approving a one-third fee award for Bryan Schwartz Law and co-counsel, Judge David Carter of the Central District of California stated to the undersigned Plaintiffs' counsel and the highly-regarded defense counsel at McGuire Woods:

> Well, let me just personally express to you, in a very humble way, it's been a pleasure to have you both here. Your lawyering has just been excellent. You might even want to get a copy of this transcript. I think the results were exceptional; and by that, I mean, there were tremendous risks for the plaintiff but tremendous risks also for the defendant. So you have nothing but the Court's praise and compliment. I think you're excellent counsel. You worked very hard. Your briefing was just extraordinary.

Schwartz Decl., Exh. J, Excerpt of Final Approval Hearing Transcript, 16:6-15.

Here, Plaintiffs' counsel took numerous actions soon after filing suit to help reach the

favorable outcome for their clients. Plaintiffs' counsel entered into a tolling agreement with Defendants to preserve the claims of any Opt-in Plaintiffs that had not yet submitted their consent forms. Helland Decl. ¶ 24. Plaintiffs' counsel organized the Plaintiffs interested in this action and promptly opted as many as were interested into this action - ultimately 123 individual opt-ins, without any court-issued notice to the class. *Id.* ¶ 34. After the parties agreed to a relatively early mediation, Plaintiffs obtained hundreds of relevant records from Defendants to ensure that they would be prepared with a complete damage calculation at mediation and a full understanding of Defendants' potential liability. *Id.* ¶ 25. Plaintiffs' original counsel, Nichols Kaster, then brought in Bryan Schwartz Law to assist, based upon the success in the *Boyd* litigation. *Id.* ¶ 28.

Plaintiffs' counsel Bryan Schwartz litigated vigorously against undersigned defense counsel in the *Boyd* matter, through conditional and class certification and summary judgment, among other motions. At all times, they have maintained a professional, but strictly adversarial relationship in the appraisers' litigation, with Schwartz seeking to obtain (and succeeding in obtaining) the most advantageous possible results for the appraisers. Schwartz Decl. ¶¶ 14-17.

After a full-day mediation with a highly experienced class action mediator - Mark Rudy - among the top wage-and-hour mediators in the country (Schwartz Decl. ¶ 14; Exhibit D, Rudy CV) - Plaintiffs remained unsatisfied with the terms offered. Schwartz Decl. ¶ 15. With negotiations appearing to reach an impasse, Plaintiffs' counsel prepared to move for summary judgment and conditional certification pursuant to this Court's Standing Order Rule 4.A. *Id.* ¶ 16. However, Plaintiffs continued to negotiate with Defendants' counsel with the assistance of Mediator Rudy in the following weeks. *Id.* ¶ 17; *see Hernandez v. Anjost Corp.*, No. 11 CIV. 1531 AT, 2013 WL 4145952, at *2 (S.D.N.Y. Aug. 14, 2013) (Torres, J.) (granting approval in NY wage and hour class action in part because "[t]he assistance of an experienced mediator ... reinforces that the Settlement Agreement is non-collusive."). Finally, the parties were able to reach the favorable outcome for Plaintiffs reflected here.

E.     **No Fraud or Collusion is Present in this Settlement.**

Nothing in the Settlement or the parties' negotiations indicates any type of impropriety in this Settlement.

Thus, each *Beckert* factor heavily weighs toward approval of the proposed Settlement.

II.    **THE STANDARD OF APPROVAL FOR A FLSA SETTLEMENT IS LOWER THAN FOR A RULE 23 SETTLEMENT, FURTHER SUPPORTING APPROVAL HERE.**

In Rule 23 class actions, though a court has the duty to consider the reasonableness of a settlement, to protect absent class members, "the court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a mini-trial of the merits of the action." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575-76 (S.D.N.Y. 2008) (McMahon, J.) (citing *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir. 1982)). "As such, the court should assess the settlement as presented, without modifying its terms, and without substituting its

business judgment for that of counsel, absent evidence of fraud or overreaching." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (Lynch, J.); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F.Supp. 729, 737 (S.D.N.Y.1993) (Cannella, J.) (same).

While courts' role in Rule 23 settlement approval is thus limited, as this Court has repeatedly recognized, "The standard for approval of an FLSA settlement is *lower* than for a Rule 23 settlement." (ital. added) *Henry v. Little Mint, Inc.*, No. 12 CIV. 3996 CM, 2014 WL 2199427, at *7 (S.D.N.Y. May 23, 2014) (McMahon, J.) (citing *Massiah v. MetroPlus Health Plan, Inc.*, No. 11-CV-05669 BMC, 2012 WL 5874655, at *5 (E.D.N.Y. Nov. 20, 2012)); *Hall v. ProSource Techs., LLC*, No. 14-CV-2502 (SIL), 2016 WL 1555128, at *9 (E.D.N.Y. Apr. 11, 2016) (same). This is because, while a Rule 23 settlement has absent class members whose interests the court seeks to protect, here, every Plaintiff personally signed the settlement, and as such, the settlement "does not implicate the same due process concerns as does a Rule 23 settlement." *Massiah,* 2012 WL 5874655, at *5 (citing, *inter alia*, *Sewell v. Bovis Lend Lease, Inc.,* No. 09 Civ. 6548, 2012 WL 1320124, at *10 (S.D.N.Y. Apr. 16, 2012) (Ellis, M.J.) ("Courts approve FLSA settlements so long as they are the result of contested litigation where adversarial parties reach an agreement on disputed issues."); *see also Torres*, 2010 WL 5507892, at *6-7 (same, citing *deMunecas v. Bold Food, LLC,* No. 09-CV-00440 DAB, 2010 WL 33-22580, at *6 (S.D.N.Y. Aug. 23, 2010) (Batts, J.)).

Unlike in a Rule 23 action, where class members are automatically participants unless they opt-out, here, each Plaintiff not only opted into the case, but subsequently, specifically embraced this settlement and all of its terms. Anyone declining the named Plaintiffs' and undersigned counsel's representation, or not satisfied with the outcome of settlement negotiations, had multiple opportunities to decline participation – at the outset, or after the settlement was reached – and chose to remain part of the case. All others have a full right to pursue their own actions, by virtue of their non-participation here, under 29 U.S.C. §216(b). As such, and because (as discussed above) the settlement is a reasonable compromise of the parties' dispute, the Court should readily grant approval. *See, e.g., Torres,* 2010 WL 5507892, at *6.

## III. *LYNN'S FOOD* SHOWS WHY THIS SETTLEMENT SHOULD BE APPROVED.

Returning to the original source of the jurisprudence regarding FLSA settlement approval, *Lynn's Food,* is illuminating. In *Lynn's Food,* the Eleventh Circuit disapproved FLSA settlement agreements where the employer coerced unrepresented employees to share $1,000 among 14 employees. *Id.,* 679 F.2d at 1352. The Department of Labor had already found the employees were entitled to back wages under the FLSA, worth more than 10 times as much. *Id.* The employees had no access to an attorney, some could not even speak English, and they "seemed unaware" of the DOL's findings in their favor. *Id.* at 1354.

The court detailed the unfairness of the "settlement" process, discussing a transcript of "negotiations" between the employer and its employees:

[T]he transcript provides a virtual catalog of the sort of practices which the FLSA was intended to prohibit. Lynn's representative repeatedly insinuated that the employees were not really entitled to any back wages, much less the amounts

calculated by the Department of Labor. The employees were told that when back wages had been distributed as a result of past actions taken by the Department of Labor, "Honestly, most everyone returned the checks ..." It was suggested that only malcontents would accept back wages owed them under the FLSA: the representative stated, "some (employees) ... indicated informally to Mr. Lynn and to others within Lynn's Food Stores that they felt like they had been paid what they were due, and that they were happy and satisfied with the arrangements which had been made." Employees who attempted to suggest that they had been paid unfairly were told by the representative "we're not really here to debate the merits of it ..." and that the objections would be taken up at "another time". The representative summed up the proceedings with this comment, "(t)hose who feel like they've been paid fairly, we want to give them an opportunity to say so."

*Id.* It was on this basis that the court justifiably limited private settlements of FLSA claims – to "prohibit such invidious practices" as bargaining between a company and its disempowered, unrepresented workers *who have already prevailed* in their claims on the merits. *Id.* at 1354-1355.

The employees in this case worked as residential real estate appraisers, whose job it is to research, review and complete reports on valuation of residential real estate, used in connection with mortgage loan transactions – hardly the group of food service workers (some non-English-speaking) at issue in *Lynn's Food.* Moreover, as detailed above, *all* of these Plaintiffs personally *chose not to* opt-into in the *Boyd* matter, and then, after seeing the *Boyd* result, opted into this new case, and affirmatively chose to accept the settlement – showing a level of independence and personal, legal sophistication not present among the *Lynn's Food* workers. Unlike the workers in *Lynn's Food,* here, none of the Plaintiffs still work for Bank of America /Landsafe – the company was bought by CoreLogic – and as such, Defendants cannot exert the same kind of pressure or coercion that was present in *Lynn's Food. See Beckert,* 2015 WL 8773460, at \*2 ("it seems unlikely that Beckett was unduly pressured to settle, as he no longer works for defendants") (citing *Cisneros v. Schnipper Rest. LLC,* No. 13 Civ. 6266 (JMF), 2014 WL 67235, at \*1 (S.D.N.Y. Jan. 8, 2014) (Furman, J.) (concerns about coercion "not as relevant when the plaintiffs no longer work for the defendant")).

*Lynn's Food* also recognized that, in a case such as ours, the concerns present in that case would be much less likely to exist, explaining:

Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context. The employees are likely to be represented by an attorney who can protect their rights under the statute. Thus, when the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching. If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in

dispute; we allow the district court to approve the settlement in order to promote the policy of encouraging settlement of litigation.

*Id.,* 679 F.2d at 1354. As such, though cases such as *Beckert* hold that more detailed approval submissions are required, such should be reviewed based upon the original concerns articulated in *Lynn's Food.* Where – as here – there is a pending case with significant remaining litigation risk for the Plaintiffs, the Plaintiffs are represented by competent counsel, the settlement provides substantial compensation, and the Plaintiffs have each personally agreed to the settlement – without coercion – this Court should not hesitate to grant approval.

## IV.   THIS SETTLEMENT AVOIDS THE PITFALLS OF REJECTED SETTLEMENTS, AND COMPARISON WITH OTHER APPROVED WAGE-HOUR SETTLEMENTS STRONGLY SUPPORTS APPROVAL.

*Beckert* originally disapproved of the FLSA settlement in question (2015 WL 6503832) and later approved it (2015 WL 8773460 (S.D.N.Y. Dec. 14, 2015)). "The Court declined to approve the first application because the parties did not provide sufficient information about the bona fides of the dispute or documentation supporting the requested attorneys' fees." *Id.* at *1. After the parties submitting the requested information, the court approved a settlement by which the plaintiff received a total of less than $30,000 for what the plaintiff claimed were two and a half years of almost entirely unpaid work (defendant claimed it was only one week). *Id.* Counsel received the balance of the $45,000 total settlement. *Id.* at *3.

In *Beckert,* the parties had initially failed to specify what the defendant's defenses would have been, that might have caused the plaintiff to lose on some or all of his claims, and gave no information on how much was at stake in the suit. *Id.*, 2015 WL 6503832, at *2. The parties also failed to provide declarations and documentation in support of the attorneys' fees request. *Id.* In subsequently approving the FLSA settlement, the court explained:

> [T]he amount Beckert would receive under the Agreement ($29,557.97) is a substantial proportion of the maximum possible recovery he identifies ($114,700)….Beckert could well receive, post-trial, much less than this maximum possible recovery….In light of these litigation risks, the decision to forgo the burden and expense of trial is reasonable.

*Id.*

In comparison with the approved *Beckert* FLSA settlement (26% of full relief), the $5,207,963.55 net Plaintiff recovery here, compared with $8,380,000 in calculated wage damages at 10 overtime hours per week, is extremely favorable to Plaintiffs.[9] This is especially

---

[9] While it is proper to assess the settlement amount by comparing it with the "best possible" recovery, that does not mean that the Court should rigidly measure the settlement amount against some purely theoretical, best-case-scenario sum, which plaintiffs may have had little realistic chance of actually recovering. *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 179-80 (W.D.N.Y. 2011); *Dupler v. Costco Wholesale Corp.,* 705 F.Supp.2d 231, 246 (E.D.N.Y.2010) ("[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery

so, in light of the risk that *all* of Plaintiffs' claims could be worth zero if Defendants' exemption defenses were found valid, or worth millions of dollars less if the highly-compensated exemption were applied to Plaintiffs, or the fluctuating work week method were found to apply, or Plaintiffs' overtime hours were found to be less than those estimated by Plaintiffs, as discussed above.

In *Lopez v. Nights of Cabiria, LLC*, the court declined to approve the proposed settlement because the parties failed to substantiate its reasonableness, failed to disclose the representative plaintiffs' service award amounts, included a broad confidentiality provision in the settlement agreement and a broad release for non-representative plaintiffs, and failed to submit contemporaneous billing records to substantiate their request for attorneys' fees, despite requesting an abnormally high 40 to 43.6 percent of the gross settlement. *Id.*, 96 F. Supp. 3d 170, 174, 176-77, 181 (S.D.N.Y. 2015). *None* of the *Lopez* concerns are present here.

This settlement also lacks the deficiencies of other rejected deals, *e.g.*: nominal relief (*Lynn's Food*, 679 F.2d at 1352 (less than 10% of full relief, *after* a liability finding by DOL)); or, a confidentiality provision (*see Wolinsky,* 900 F.Supp.2d at 337 ("Considering all of these factors in the present case, the Court would be inclined to approve the parties' proposed settlement, but for one fact: The settlement agreement contains a confidentiality provision.")).

This Court has lately approved numerous settlements in wage/hour class actions providing far less relief to class members than Plaintiffs are receiving here. In May 2012, this Court granted final approval to a settlement of roughly $2.5 million for a class of 1,501 people. *See Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 624 (S.D.N.Y. 2012) (Carter, J.). The court found that, even if, as the objectors contended, the total exposure for the case was $125 million, the settlement could still reasonably be approved, given the litigation risks. *Id.* In other words, even if the settlement paid just 2% of the defendant's overall exposure, the court still approved it. *See id.* The average payment to the claimants in that case was approximately $1,100 *before* deduction for the costs of paying the claims administrator. *Id.* Similarly, in April 2013, the Southern District granted approval to a $4.9 million settlement for 1,735 employees of KeyBank who worked as "relationship managers," with a net settlement fund of $3,184,053. *See Beckman*, 293 F.R.D. at 467. If all settlement class members participated, the result would be $1,835.18 per class member. *Id. See also, e.g., Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 57-58 (E.D.N.Y. 2010) (approving settlement providing 17% of full value in wage class action) (citing *Grinnell,* 495 F.2d at 461-462).

For all of the foregoing reasons, this Court should approve the favorable settlement here.

---

does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved") (quoting *Grinnell,* 495 F.2d at 455).

## V.     THE REQUESTED ATTORNEYS' FEES – ALREADY PERSONALLY APPROVED BY EACH PLAINTIFF – ARE A REASONABLE 25% OF THE FUND, AVOIDING THE CONCERNS OF *LOPEZ*.

The settlement created a $7 million common fund (none of which will revert to Defendants when this settlement is approved), to be distributed to the Plaintiffs and counsel (and to the administrator), upon approval. Schwartz Decl., Exh. A, at ¶ 46. The settlement agreement permits Plaintiffs' counsel to request an attorneys' fees award up to 25% of the common fund. *Id.* at ¶ 49.

Each Plaintiff in this case opted-into the matter and subsequently reviewed and personally chose to join in the settlement. Helland Decl. ¶¶ 5-8. Each previously signed a representation agreement with counsel whereby he or she agreed to pay the greater of one-third of a settlement or judgment, or all court-awarded fees. Helland Decl. ¶ 21. When considering whether to join in this settlement, each Plaintiff was specifically told his or her share, and told that the share was based upon the presumption that counsel would be allocated 25% of the settlement. Schwartz Decl., Exhibit A, Exhibit to Settlement Agreement. Each Plaintiff's share will be greater than the amount quoted in the settlement notice. *Id.* at ¶5.

There is a "greater range of reasonableness for approving attorneys' fees" where a plaintiff individually agrees to settle, including fees, after negotiations. *Misiewicz v. D'Onofrio Gen. Contractors Corp.,* No. 08CV4377(KAM)(CLP), 2010 WL 2545439, at *5 (E.D.N.Y. May 17, 2010), *report and recommendation adopted,* No. 08-CV-4377 KAM CLP, 2010 WL 2545472 (E.D.N.Y. June 18, 2010). *See also Cisek v. Nat'l Surface Cleaning, Inc.,* 954 F.Supp. 110, 111 (S.D.N.Y.1997) (Kaplan, J.) (same); *Wolinsky,* 900 F.Supp.2d at 336 (same, citing *Misciewicz* and *Cisek*).

### A.     The Court should award fees based upon the percentage-of-the-fund method.

"In class and collective action cases, courts often award attorney's fees as a percentage of the total fund in lieu of using the lodestar-type method...." *Wolinsky*, 900 F. Supp. 2d at 337 n. 2 (S.D.N.Y. 2012) (citing *McDaniel v. Cnty. of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010); *Alleyne,* 264 F.R.D. at 60). *See also Lopez v. Ploy Dee, Inc.*, No. 15-CV-647 (AJN), 2016 WL 1626631, at *4 (S.D.N.Y. Apr. 21, 2016) (Nathan, J.) (using "percentage of the fund" method for evaluating FLSA settlement attorneys' fees, discussing typical one third of the fund threshold, and reducing 37% proposed fee award, to award one third of settlement in fees).

In addition to the fact that each Plaintiff has already agreed to the 25% of the common fund in fees counsel now seeks as part of the exceptional settlement he or she is receiving, the common fund approach is the most equitable approach to a fee award here. In common fund situations, the attorneys whose efforts created the fund are entitled to a reasonable fee-set by the court-to be taken from the fund. *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir. 2000) (citing *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (citing cases)). The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost. *Id.*

14

The trend in this Circuit is toward awarding fees based upon the percentage method. *See Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (citing *Visa Check III,* 297 F.Supp.2d 503, 520 (E.D.N.Y.2003)); *Johnson v. Brennan*, No. 10 CIV. 4712 CM, 2011 WL 4357376, at *14 (S.D.N.Y. Sept. 16, 2011) (McMahon, J.) (collecting cases supporting percentage of common fund method in FLSA cases because it approximates real-world market transaction); *deMunecas*, 2010 WL 3322580, at *8 (collecting cases adopting the percentage of the fund method).

The percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases. *Savoie v. Merchants Bank,* 166 F.3d 456, 460-461 (2d Cir.1999). It has been noted that once the fee is set as a percentage of the fund, the plaintiffs' lawyers have no incentive to run up the number of billable hours for which they would be compensated under the lodestar method. *Id.* at 461. The percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.* (citing *In re Lloyd's Am. Trust Fund Litig.,* 96 Civ.1262 RWS, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002) (Sweet, J.)). By contrast, "[T]he lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal–Mart Stores,* 396 F.3d at 121.

The Court should employ the percentage-of-the-fund method agreed to between each of the Plaintiffs, their counsel, and Defendants here.

## B.    The *Goldberger* Factors Favor Plaintiffs' Requested 25% Fee Award.

While the Court need not undergo full Rule 23 analysis of the fees - as discussed above - to the extent the Court will evaluate the fee award, courts in the Second Circuit are guided by the so-called "*Goldberger* factors" in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of. representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger,* 209 F.3d at 50. Here, all of the *Goldberger* factors weigh in favor of awarding Plaintiffs' Counsel their requested fees.

### 1.    Counsel expended substantial time and labor.

Following the August 26, 2015 announcement of the *Boyd* settlement, Plaintiffs' counsel expended considerable time communicating with over one hundred individuals regarding their claims against Defendants; vetting representative plaintiffs (including cross-country travel); researching, drafting, and filing the complaint and first amended complaint in collaboration with the representative plaintiffs; negotiating a tolling agreement with Defendants prior to the parties' mediation; drafting a mediation brief and generating Plaintiffs' damages calculation; interviewing opt-in plaintiffs regarding hours worked in support of Plaintiffs' damages calculations; attending a full-day mediation and continuing arms' length negotiations thereafter; drafting letters to the court as pre-condition for filing motions for conditional certification and summary judgment when post-mediation negotiations appeared uncertain to lead to settlement; and communicating with the opt-in plaintiffs in this matter regarding the proposed settlement.

Schwartz Decl ¶5; Helland Decl. ¶23. Just in the last two months, Plaintiffs' counsel has communicated with every opt-in Plaintiff, and has called and emailed with dozens of opt-in Plaintiffs regarding specific terms of the Settlement and investigated several concerns raised. Schwartz Decl ¶21; Helland Decl. ¶7. Ultimately, every Plaintiff was satisfied, or more often, overjoyed with the outcome, which Plaintiffs' counsel spent approximately 500 hours to obtain. Schwartz Decl ¶¶ 18, 28; Helland Decl. ¶¶ 8, 32.

Plaintiffs' counsel's contemporaneously-kept, itemized billing records detail to the nearest 1/10 of an hour every conversation, email, and bit of research, writing, advocacy, travel, and mediation they performed on their clients' behalf. Schwartz Decl., Exh. E, Bryan Schwartz Law Time Records; Helland Decl. Exh. B, Nichols Kaster Time Records.

This is not to suggest the outcome was slow in coming - far from it. As is clear from the *Davis* case (12 years), and even the *Boyd* matter (3 years) (Schwartz Decl., ¶13), this exceptional result will also get Plaintiffs paid exceptionally quickly. Far from detracting from a fee award, this sort of performance should be rewarded - and the desirability of faster, favorable outcomes is precisely the reason for using a percentage-of-the-fund method, rather than the lodestar method. *Savoie,* 166 F.3d at 461; *Zeltser v. Merrill Lynch & Co.*, No. 13 CIV. 1531 FM, 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (Maas, M.J.) (notwithstanding high multiplier on lodestar, "this should not result in penalizing Plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial") (citing, *inter alia, Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 n. 5 (9th Cir. 2002) ("class counsel should [not] necessarily receive a lesser fee for settling a case quickly; in many instances, it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief")).

In short, after ten months of vigorous but uncompensated (as of yet) efforts, Plaintiffs' counsel secured a settlement that is an even better deal (on a FLSA, per workweek basis) than the one obtained by similarly situated non-California collective action members in the *Boyd* case. Schwartz Decl., ¶10; Helland Decl. ¶5.

###   2.    The large and complex nature of this litigation warrant the award of attorneys' fees being requested.

Hybrid FLSA and state wage-and-hour cases are often large and complex. *See Febus v. Guardian First Funding Grp., LLC,* 870 F.Supp.2d 337, 340 (S.D.N.Y.2012) (Stein, J.); *Hart,* 2015 WL 5577713, at *8 ("[T]his litigation has been quite complex. It has raised challenging issues, legal and factual, arising under the FLSA and the NYLL. This litigation has also been expensive for plaintiffs, as reflected in the time and expense records submitted in support of plaintiffs' counsel's fee application, and no doubt for defendants as well.") Here, the exemption defenses were untested in this Circuit, and coordinating 123 Plaintiffs with multiple state and federal causes of action was no mean task. Plaintiffs were litigating against skilled and experienced defense counsel. Thus, this factor favors awarding Plaintiffs' Counsel the requested fees. *See, e.g., In re Heritage Bond Litigation*, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (awarding one-third of common fund, noting that the "prosecution and management of a . . . class action requires unique legal skills and abilities"); *In re Equity Funding Corp. of Am. Sec.*

*Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977) ("[P]laintiffs' attorneys in this class action have been up against established and skillful defense lawyers, and should be compensated accordingly.")

> **3.    Plaintiffs' Counsel took on a large amount of risk in prosecuting this case.**

As was discussed in above, this case involves complex factual and legal issues as to both liability and damages. The Plaintiffs were far from guaranteed to prevail on all of these issues. Further, as Plaintiffs' counsel prosecuted this case on a contingency basis, advancing both fees and costs, counsel took on the risk that they would not ultimately recover anything for their time and effort. "Uncertainty that an ultimate recovery will be obtained is highly relevant in determining the reasonableness of an award." *Febus,* 870 F.Supp.2d at 340. Accordingly, the award of fees is appropriate in a case like this one where Plaintiffs' Counsel's fee entitlement is entirely contingent upon success. *See Willix v. Healthfirst, Inc.,* No. 07 CIV. 1143 ENV RER, 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (Reyes, M.J.).

> **4.    Plaintiffs' Counsel's representation has been of the highest quality.**

"To determine the quality of representation, courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Guzman v. Joesons Auto Parts,* CV 11–4543 ETB, 2013 WL 2898154, at *3 (E.D.N.Y. June 13, 2013). A court may take into consideration the quality of counsel's submissions to and work before the court, counsel's past experience litigating other, similar cases, and whether counsel "achieved a reasonable recovery" for plaintiff. *Id.* As discussed above, counsel has achieved an extraordinary recovery for Plaintiffs, and counsel have consistently been recognized for their skill representing workers, and approved by federal and state courts in matter such as this.

> **5.    The requested fees are reasonable in relation to the successful settlement outcome.**

Decisions in this Circuit which have routinely awarded one-third or more of the settlement fund as attorneys' fees in wage and hour cases. *See, e.g., Willix,* 2011 WL 754862, at *6 (awarding one-third, "consistent with the norms of class litigation in this circuit"); *deMunecas,* 2010 WL 3322580, *8 (one-third); *Clark v. Ecolab Inc.,* 2010 WL 1948198, *8 (S.D.N.Y. May 11, 2010) (Crotty, J.) (one-third); *Hart*, 2015 WL 5577713, at *16 (approximately one-third).

"'The most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case 'is the degree of success obtained' by the plaintiff." *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 12 (S.D.N.Y. 2015) (Dolinger, M.J.) (quoting *Barfield v. New York City Health and Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008)). Here, as described above, by any measure, the litigation has been dramatically successful for Plaintiffs, who are recovering tens of thousands of dollars a person, on average, a large percentage of their full relief, relatively early in the case. Despite this phenomenal result, counsel seeks only 25%. Accordingly, this factor weighs in favor of approval of the requested fees.

####      6.      Public policy weighs in favor of awarding attorneys' fees.

In wage-and-hour class action lawsuits, public policy favors a common fund attorneys' fee award. *Willix,* 2011 WL 754862, at \*6. Where relatively small claims can only be prosecuted through aggregate litigation, "private attorneys general" play an important role. *Id. citing Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 338–39 (1980). "The goals of the FLSA and NYLL are served only if capable, experienced attorneys stand ready to help prosecute violations. Without such attorneys, plaintiffs pleading FLSA and NYLL violations will be left without recourse even when they have valid claims." *Hart,* 2015 WL 5577713, at \*18; *see also Goldberger* 209 F.3d at 51 (commending the general "sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest"). "The FLSA and state wage and hour statutes are remedial statutes, the purposes of which are served by adequately compensating attorneys who protect wage and hour rights." *Beckman*, 293 F.R.D. at 477.

Based upon the negotiated fee agreement in this case, the typical percentage of compensation in similar cases in this Circuit and nationwide, and the *Goldberger* factors, Plaintiffs' counsel is entitled to a reasonable attorneys' fees award of 25% of the common fund.

####      C.      The *Lopez* Concerns Are Not Present Here.

The Court asked counsel to address *Lopez v. Nights of Cabiria,* but, as the Court can now see, that case is unlike this one. *Lopez* involved three, tipped delivery drivers who settled for $27,500, with plaintiffs' counsel seeking to retain between 40 and 43.6 percent in fees. *Id.*, 96 F. Supp. 3d at 173-74. The settlement had numerous problems (discussed *supra,* in Section IV), but as to fees, denied the request because "a proper fee request 'entails submitting contemporaneous billing records documenting, for each attorney, the date, the hours expended, and the nature of the work done.' The present submission includes none of this information." *Id.* at 181-182. Here, on the contrary, Plaintiffs have submitted all of this contemporaneous billing data to support the request and determine a lodestar for a cross-check. Schwartz Decl., Exh. E; Helland Decl., Exh. B. *Lopez* is therefore readily distinguishable.

####      D.      The Lodestar "Cross Check" Further Supports an Award to Plaintiffs' Counsel of 25% of the Settlement Fund.

Following *Goldberger,* the trend in the Second Circuit has been to apply the percentage method and to loosely use the lodestar method as a "cross check." *Goldberger,* 209 F.3d at 50. In calculating the lodestar for cross check purposes, the "hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.* Courts then consider whether a multiplier is warranted based on factors such as (1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved. *In re Boesky Sec. Litig.,* 888 F.Supp. 551, 562 (S.D.N.Y.1995) (Pollak, J.); *see also Goldberger,* 209 F.3d at 47. Here, as based upon each of these factors, discussed thoroughly above, the cross-check supports the

requested award, resulting in an 8.79 multiplier (*i.e.,* (25% x $7 million)/$199,815 billed fees)[10].

"Courts regularly award lodestar multipliers of up to eight times lodestar, and in some cases, even higher multipliers." *Zeltser*, 2014 WL 4816134, at *9-10 (citing, *inter alia*, *Vizcaino*, 290 F.3d at 1052–54 (listing nationwide class action settlements where multiplier ranged up to 19.6); *Cosgrove v. Sullivan*, 759 F.Supp. 166, 167 n. 1 (S.D.N.Y. 1991) (Goettel, J.) (awarding multiplier of 8.74); *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05 Civ. 11148, 2009 WL 2408560, at *2 (D.Mass. Aug. 3, 2009) (awarding multiplier of 8.3); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. CIV.A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (15.6 multiplier). *See also Ramirez v. Lovin' Oven Catering Suffolk, Inc.,* No. 11 Civ. 520, 2012 WL 651640, at *4 (S.D.N.Y. Feb. 24, 2012) (Cott, M.J.) (granting attorneys' fees equal to 6.8 times lodestar); *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 371 (S.D.N.Y. Jan. 29, 2002) (McMahon, J.) ("modest multiplier" of 4.65 in wage and hour class action approved).

As this Court noted, in *Yuzary v. HSBC Bank USA, N.A.*, No. 12 CIV. 3693 PGG, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (D'Agostino, J.), awarding a multiplier of 7.6 in a wage and hour misclassification class action was justified to avoid "penalizing plaintiffs' counsel for achieving an early settlement, particularly where, as here, the settlement amount is substantial." The same is true here.

Finally, the lodestar multiplier counsel seeks is also reasonable because it will diminish over time. *See Parker v. Jekyll & Hyde Entm't Holdings, LLC,* No. 08 Civ. 7670, 2010 WL 532960, at *2 (S.D.N.Y. Feb.9, 2010) (Francis, M.J.). In wage and hour class cases, plaintiffs'

---

[10] Though the percentage-of-the-fund approach should be used, Plaintiffs' counsel supply declarations in support of the hourly rates claimed in constituting their lodestar. *See* Schwartz Decl. ¶ 24; Helland Decl ¶ 31. As noted in the declarations, the hourly rates have been approved by other federal courts (including in the *Boyd* matter), are routinely charged by Plaintiffs' counsel when they have hourly-paying clients (though such is not the majority of their practice), and are consistent with market rates. *See* Schwartz Decl. ¶ 29; Helland Decl. ¶ 31; Declaration of Rachel Bien, Esq. ("Bien Decl.") ¶¶ 6-10, and Declaration of Bruce E. Menken, Esq. ¶ 11-17; *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany,* 493 F.3d 110, 111–12 (2d Cir.2007) (rate paid by clients is a presumptively reasonable fee). In 2015, in a similar misclassification wage and hour settlement, Your Honor approved a one-third-of-the-fund fee award based upon a lodestar cross-check involving claimed rates of $725 per hour for a 1998 graduate and $575 per hour for a 2005 graduate. Bien Decl. ¶ 8 (whose rate per hour is $625 in 2016); Schwartz Decl., ¶ 35, Exh. K, Approval Order and Rates in *Hernandez, et al. v. UBS AG, et al.,* 1:15-cv-00230-VSB. The award resulted in a significant multiplier on these rates. *Id.* Based upon their graduation years, Plaintiffs' counsel's claimed rates are below those of Plaintiffs' counsel in *Hernandez v. UBS,* and lower than the rates of many top attorneys in the New York market, which is the relevant market. A National Law Journal Study showed average New York partner rates in 2014 ranging from $1,055/hour to $915/hour at top firms, and average associate rates ranging from $620/hour to $410/hour at the same firms. *See* Schwartz Decl., Exh. I.

counsel is often called upon to perform work after the final approval hearing, including answering class member questions, answering questions from the claims administrator, and negotiating and sometimes litigating disagreements with defendants about administering the settlement and distributing the fund. *See* Helland Decl. ¶37. The fact that Plaintiffs' Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request. *See Reyes,* 2011 WL 4599822, at *8.

## VI.   REASONABLE LITIGATION EXPENSES SHOULD BE REIMBURSED.

The Court should also award counsel reimbursement of their litigation expenses in the amount of $12,336.45. *See* Schwartz Decl. Exh. E; Helland Decl. Exh. C. Courts typically allow counsel to recover their reasonable out-of-pocket expenses. *See Kuzma v. Internal RevenueService,* 821 F.2d 930, 933–34 (2d Cir. 1987); *In re Indep. Energy Holdings PLC Sec. Litig.,* 302 F.Supp.2d 180, 183 n. 3 (S.D.N.Y. 2003) (Scheindlin, J.). Here, Plaintiffs' counsel's modest unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class. (Helland Decl. Exh. C; Schwartz Decl. Exh. E.) Plaintiffs' current costs do not include any costs for an in-person hearing on this motion. (Helland Decl. ¶35; Schwartz Decl ¶.23.)

Finally, Rust Consulting, one of the nation's largest third-party settlement administrators, was retained to administer the settlement payments. The Settlement Administrator's fees are estimated to be $12,000, including fees incurred and anticipated future costs for completion of the administration - less than 2/10 of one percent of the common fund. Helland Decl. ¶ 36. Accordingly, the parties respectfully request that the Court approve payment of the Settlement Administrator's fees in the amount of $12,000 subject to counsel's review of the Settlement Administrator's invoices.

## VII.   ALL ADDITIONAL SETTLEMENT TERMS ARE FAIR.

### A.   The Named Plaintiffs' Proposed Service Payments are Fair.

The jurisprudence and facts of this case justify the Named Plaintiffs' proposed service payments of $3,000 each – less than five hundredths of a percent of the common fund a piece. *See, e.g., Hernandez v. Merrill Lynch & Co.,* No. 11 CIV. 8472, 2013 WL 1209563, at *10 (S.D.N.Y. Mar. 21, 2013) (Freeman, J.) (awarding $15,000 to each named plaintiff and $4,000 to opt-in plaintiff because "[i]t is important to compensate plaintiffs for the time they spend and the risks they take."). Here, where the Named Plaintiffs believed they faced the risk of blackballing in their tight-knit industry and have signed a broader release than non-named Plaintiffs, undersigned counsel believes a $3,000 service payment to each Named Plaintiff is the minimum which would viably promote the public policy interest in encouraging those with wage claims to assert them, despite the fears, stress, and significant time associated with doing so. Schwartz Decl. ¶¶ 30-31.

### B.     The Requested Cy Pres is Appropriate.

The requested *cy pres* beneficiary, Make the Road New York ("MTRNY"), is an appropriate *cy pres* because this is a workers' rights suit seeking to enforce wage protections in New York and beyond, and MTRNY is an organization that, in part, is committed to protecting and training workers. *See, e.g., Reyes v. Buddha-Bar NYC*, Civ. No. 08-02494, 2010 WL 2545859, at *1 (S.D.N.Y. June 18, 2010) (Freeman, J.) (approving Make the Road New York as *cy pres* recipient in wage and hour class action). The Court should approve this entity to benefit in the unlikely event that a Plaintiff fails to deposit their check within six months of mailing. Settlement Agreement ¶ 59.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) approve the settlement in its entirety; (2) approve Plaintiffs' counsel's request for an award of attorneys' fees in the amount of $1,750,000 (25% of the settlement fund); (3) approve of Plaintiffs' counsel's request for reimbursement of litigation costs in the amount of $12,336.45 and $12,000 in Settlement Administrator costs; (4) approve $3,000 enhancement payments to each of the named Plaintiffs; and (5) approve the *cy pres* beneficiary, Make the Road New York.

DATED: June 17, 2016

BRYAN SCHWARTZ LAW
NICHOLS KASTER PLLP

By: _____
Bryan J. Schwartz, Esq.

21